SCANNED
DATE:
BY:

**UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF MASSACHUSETTS**

)
Julia Heavern, et al.                                    )
                                                        )
            Plaintiffs,                                 )
                                                        )
                                                        )        **CIVIL ACTION NO.: 05-11170-MEL**
v.                                                      )
                                                        )
                                                        )
Mariott International Inc.                              )
and Zurich North America,                               )
                                                        )
            Defendants.                                 )
_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANT ZURICH NORTH AMERICA'S MOTION FOR SUMMARY JUDGMENT

Now come the Plaintiffs who hereby oppose the Motion of the Defendant Zurich

North America, hereinafter "Zurich," for Summary Judgment, pursuant to Fed. R. Civ. P.

56(c). Zurich is not entitled to summary judgment as a matter of law on Count VI of the

complaint, and should not be dismissed from this case, because several issues of material

fact remain.

### I.    Plaintiffs' Response to Zurich's Statement of Material Facts

The Plaintiffs' hereby respond to Zurich's Statement of Undisputed Facts

1.    Admitted.

2.    Admitted.

3.    Admitted in part and denied in part. See Plaintiffs' Statement of
       Additional Material Facts, below. Admitted, in that a written
       Demand Letter was sent to Zurich's claims agent for each of the
       five plaintiffs. Denied, in that Zurich has omitted relevant portions

of the letters. Also attached to the letters was medical records, an expert report, and a copy of the pool's chlorine reading for the date of the incident.

## II.    Plaintiff's Statement of Additional Material Facts

1.    Zurich failed to respond to Plaintiffs' written Demand Letter within thirty days. The letters were mailed on June 21, 2004. The plaintiffs waited more than thirty days from the date of the demand letter before filing this lawsuit. See copy of Complaint, at ¶¶ 29, 33, attached hereto as Exhibit F.

2.    On June 21, 2004 each Plaintiff sent Zurich a written demand for settlement, after there were unsuccessful attempts to resolve the matter over the telephone. Exhibit A at ¶ 29. The five demand letters each contained medical records from the South Shore Hospital, a copy of the Pool and Spa Chemical Test for the day in question, and an expert opinion regarding the relationship of the levels of chemicals in the pool the plaintiffs' injuries.

3.    Each of the written Demand Letters included the following statement:

*"Please allow this letter to serve as our demand for settlement."* and at the end of each letter,

*"Kindly contact me if you wish to discuss settlement of these matters within 30 days of your receipt of correspondence. Demand for settlement in this matter is....."*

2

Id. at Exhibits A-E.

4.   Each of the five Demand Letters defines the injuries of the
     plaintiffs and the relief sought. Id.

5.   The Demand Letters also all make reference to one of the six
     factors that qualifies a letter as a written demand under the
     consumer protection statute that is, a reference that a claimant
     anticipates a settlement offer within thirty days. Id.

6.   Attached to each demand letter was a copy of the expert report of
     Dr. William B. Patterson that states a causal relationship between
     the improper maintenance of the pool and the accumulation of
     chloramines at high enough levels to cause the mucous membrane
     and skin irritation, such as suffered by the plaintiffs. Exhibits A-E.

7.   Another expert report from Thomas E. Hamilton, CIH also
     attributes the children's injuries to "*a reasonable professional
     certainty that the failure of the Mariott Courtyard personnel to
     properly restrict the use of the swimming pool until the shocking
     treatments had effectively been completed and chlorine levels
     brought down to normal levels is the direct cause of the health
     issues suffered by the minors*." Written Report of Thomas E.
     Hamilton, attached hereto, as Exhibit G.

**III.       Argument**

3

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." Sanches v. Alvard, 101 F.3d 223, 227 (1st Cir. 1996). A genuine issue is "one that must be decided at trial because of the evidence, viewed in the light most favorable to the non-movant, would permit a rational fact finder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Therefore, to prevail on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st. Cir. 1990). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." Leblanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994).

Where a party moving for summary judgment asserts that there is no genuine issue of fact, the Judge considering the motion must review all the evidence before the Court and determine "whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991), quoting from Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Applying this standard Zurich has failed to meet its burden. Summary judgment therefore is inappropriate, because genuine issues of material fact exist.

4

**A.    The Plaintiffs' Written Demands For Settlement Were Proper
Demand Letters and Satisfy the Requirements of M.G.L. c. 93A,
Section 9.**

The plaintiffs are not barred from asserting a M.G.L. c. 93A claim against Zurich

because proper Demand Letters were sent to Zurich more than 30 days prior to the

initiation of this action. A demand letter under c. 93A § 9 must meet certain criteria. The

purpose of the demand letter is to facilitate the settlement and damage assessment aspects

of c. 93A and, as such, the letter and notice therein is a procedural requirement the

absence of which is bar to a suit. Entrialgo v. Twin City Dodge Inc., 368 Mass. 807, 813

(1975). One of the functions of the demand letter "is to encourage negotiations and

settlement by notifying prospective defendants of claims arising from allegedly unlawful

conduct." Slaney v. Westwood Auto Inc., 366 Mass. 688, 704 (1975).

In order to qualify as a written demand letter under c. 93A, a letter must, in

addition to defining the injury suffered and the relief sought, make reference to some

signal to alert a reasonably perceptive recipient. Cassano v. Gogos, 20 Mass. App. Ct.

348, 350 (1985). Six ways to alert the defendant are, "(1) an express reference to c. 93A;

(2) any express reference to the consumer protection act; (3) any assertion that the rights

of the claimants as consumers have been violated; (4) any assertion that the defendant has

acted in a deceptive manner; **(5) any reference that the claimants anticipate a

settlement offer within 30 days;** (6) any assertion that the claimant will pursue multiple

damages and legal expenses should relief be denied." Id. at 350.

The June 21, 2004 written Demand Letters satisfy the requirements for a valid

Chapter 93A demand letter because each letter states the specific injuries of the plaintiffs,

the relief sought, and reference that the plaintiff expected or anticipated a settlement offer

5

with thirty days. Each letter states specific injuries that the plaintiff's have suffered. Exhibits A-E. Each letter also specifically indicates the relief sought. Id. After describing the injuries sustained, the five letters contained the following statement, "kindly contact me if you wish to discuss settlement within 30 days of your receipt of this correspondence. Demand for settlement in this matter is …." Id. [1] The letters stated that the plaintiffs anticipated a settlement offer within thirty days of the letter which meets the fifth factor of the requirements for a Chapter 93A demand letter. Casano, 20 Mass. App. Ct. at 350. The defendants were alerted twice in each letter that there was a demand for settlement. Exhibits A-E. Summary judgment should not be granted in favor of Zurich because the Demand Letters were proper to alert Zurich that the plaintiffs would be seeking relief under Chapter 93A.

## B.    Several Genuine Issues of Material Fact Exist, Precluding the Entry of Summary Judgment.

### 1.    Zurich's Own Moving Papers Demonstrate That A Genuine Issue of Material Fact Exists

Zurich does not dispute that a genuine issue of material fact exists as to the cause of the Plaintiffs' injury. In its motion for Summary Judgment, Zurich states "the cause of the minor Plaintiffs' injuries is not clear." Memorandum in Support of Motion For Summary Judgment at p. 6. Zurich then offers various alleged, potential, alternative causes for Plaintiffs' injuries. Id. These alternative theories in Zurich's motion for Summary Judgment clearly demonstrate that a genuine issue of material fact exists.

### 2.    A Genuine Issue of Material Fact Exists As To Whether Zurich's Insured's Liability Was Reasonably Clear

---

[1] The settlement demands were as follows: (1) Julia Heavern in the amount of $50,000; (2) Nicole Heavern in the amount of $500,000; (3) Kerin Mitchell in the amount of $50,000; (4) Taylor Vieira in the amount of $150,000; and (5) Brian Vieira in the amount of $150,000.

6

There are genuine issues of material fact as to whether Zurich's liability was reasonably clear, and therefore whether Zurich was under a duty to extend a settlement offer to the plaintiffs and, as such, summary judgment is not appropriate. Zurich had an obligation to investigate the Plaintiffs' claims and to make a reasonable offer of settlement once its insured's liability is reasonably clear. M.G.L. c. 176D, § 3(9)(f). Chapter 176D and c. 93A together require and insurer to promptly make a fair and reasonable settlement offer when its insured's liability and the amount of damages become clear, either within the thirty day period as set forth in M.G.L. 93A, §9(3), or as soon thereafter as liability and damages become clear. See Hopkins v. Liberty Mutual Insurance Company, 434 Mass. 556, 566 (2001).

Zurich should have extended an offer to the plaintiffs either thirty days after the June 21, 2004 Demand Letters as required by c. 93A, or, under c. 176D, after liability had become reasonably clear. Prior to the filing of this lawsuit on March 10, 2005 Zurich had not extended any offer to the Plaintiffs. See, Affidavit of Garrett Bradley, attached hereto as Exhibit H. Mariott's liability should have been reasonably clear to Zurich after a prompt investigation of the Plaintiffs' claims. The June 21, 2004 Demand Letters included the expert medical opinion of Dr. William Patterson stating that the childrens' skin problems were caused by chlorine by-products and also included information regarding the chemical levels in the pool. Exhibits A-E. Zurich did not request to have any of the children examined independently, belying any argument that investigation of the claim was reasonable. Therefore, summary judgment should be denied as the issue of whether liability was reasonably clear (and thus whether Zurich violated c. 176D) is a genuine issue of material fact.

**C.    Zurich's Request That Count VI of the Complaint Be Severed and Stayed**

The plaintiffs do not object to the request that Count VI of the Complaint against

Zurich be severed and stayed pending the outcome of the underlying suit against Marriott.

**WHEREFORE**, for the foregoing reasons, Zurich's Motion for Summary

Judgment should be denied.

Respectfully submitted,
For the plaintiff
By his attorney,

Garrett Bradley, Esquire BBO # 629240
THORNTON & NAUMES, LLP
100 Summer Street, 30th Floor
Boston, MA 02110
(617) 730-1339

8

EXHIBIT

A

ATTORNEYS AT LAW
# Thornton & Naumes LLP

Michael P. Thornton (NH, ME & MA)
John T. Barrett (NH & MA)
Robert T. Naumes
Neil T. Leifer (ME, NJ & MA)
David I. McMorris (NY & MA)
Edwin L. Wallace
Robert M. Byrne, Jr.
David C. Strouss
Joseph R. Donohue (ME & MA)
Patricia M. Flannery
Andrew S. Wainwright
Michael A. Lesser
Marilyn T. McGoldrick
Garrett J. Bradley
Brad J. Mitchell
Kristen Marquis Fritz

100 Summer St. • 30th Floor • Boston, MA 02110 • 617-720-1333
Toll Free 800-431-4600    FAX# 617-720-2445
www.tenlaw.com

June 21, 2004

Mr. Andrew Marthaler
Claims Specialist
Zurich North America
1400 American Lane
Schaumburg, IL 60196-1056

Re:    Our Client:        Julia Heavern
       Your Insured:      Marriott Courtyard
       Date of Incident:  3/15/03
       Your File No.:     964117146

Dear Mr. Marthaler:

As you are aware, this office represents five minor individuals with respect to personal injuries sustained on March 15, 2003 while swimming in an indoor pool at the Marriott Courtyard in Concord, NH.

Please allow this letter to serve as our demand for settlement.

## FACTS/LIABILITY

On, March 15, 2003, the above minor children along with their parents were guests at the Marriott Courtyard in Concord, NH. On that date, the children were swimming in the indoor pool for a period of approximately six hours. Upon exiting the pool that afternoon, the children began to complain of skin burning and had troubled breathing. Their parents were very concerned after examining severe facial redness and burns upon the children's faces and heads. Blotchy redness was also located on the arms and legs.

At this point, Ms. Heavern, mother of Julia and Nicole Heavern, located the day manager, Rose Reidsema who after seeing the children called the poison control unit for assistance. Ms. Reidsema informed the parents that the pool had been shocked two weeks ago and had to be shut down due to the excess in chemical. She also indicated that the pool had been "shocked" the very morning that the children were swimming in it.

When Ms. Reidsema contacted the poison control unit and explained the situation, the poison control unit informed Ms. Reidsema and the parents that the reactions the children were experiencing was due to high chlorine levels in the pool and suggested that they be seen by their pediatricians. Ms. Reidsema apologized to the parents and stated that their usual practice in shocking the pool was to shock the pool and wait 24 hours before allowing any patrons in the pool.

## INJURIES

Julia Heavern, age 6, suffered 1st degree burns due to the above referenced incident. She also experienced trouble breathing and was prescribed Bacitracin and Neomycin-Zinc Sulfate Polymyxin B Sulfate ointment to help with peeling and infection. Julia missed two days of school due to this incident as well. I have attached medical records from South Shore Hospital regarding treatment received for her injuries. Julia still must apply sun block to protect her skin.

Julia was examined by Dr. William B. Patterson on January 28, 2004. At which time, Dr. Patterson noted that Julia had developed a transient skin reaction for several weeks following the pool incident which he causally relates to the pool incident.

The pool's chemical levels were dangerously high on the date the above minor children were occupying it (I have attached a copy of the Pool & Spa Chemical Test Results taken on the date of the incident as well as evidence regarding the "shocking of pools"), no indication or warning that the pool had been shocked the morning the children were in it was given, causing all of these minor children to suffer chemical burns and troubled breathing. These children now have problems going outdoors which, as you can understand, is devastating to children.

Kindly contact me if you wish to discuss settlement of these matters within 30 days of your receipt of this correspondence. Demand for settlement in this matter is $50,000. If I do not hear from you I will be forced to file suit. Please feel free to contact Attorney Garrett Bradley in my office to discuss this case as well.

I look forward to hearing from you and settling this matter in an amicable fashion.

Respectfully submitted,

John T. Barrett

JTB:tc
Enclosures

One Harborside Drive
Logan International Airport
East Boston, MA 02128
617 568-6500
617 568-6573 fax

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer



**Logan International Health Center**
*An affiliate of Occupational Health + Rehabilitation Inc*



APR 2 8 2004

April 27, 2004

Mr. David McMorris, Esq.
Thornton and Naumes
100 Summer Street, 30th Floor
Boston, MA 02110

RE: HEAVERN, JULIA
SSN: HO5-19-1996

Dear Mr. McMorris:

On 01/28/2004, I performed a Consultation on Julia Heavern, a pleasant young girl who was exposed to chlorine in a swimming pool in March, 2003. Examination consisted of a personal interview with her parents, followed by a private interview with Julia. Their histories were consistent.

HISTORY OF PRESENT ILLNESS: Julia and her parents report that she was swimming in a Marriott pool in March, 2003, on a ski trip. She went into the pool early in the morning without difficulty. Following a break, she and other girls went back into the pool, and essentially all of them noticed mucous membrane and respiratory irritation. Julia reports that her "face was red." She went out into the hallway. She does not recall any breathing difficulty. The skin was bad enough that her parents took her to the hospital, where she was given cream for her skin. She and her parents both confirm that she made a full recovery. She did not have any notable skin problems this past year following resolution of the primary problem. Both her parents and Julia deny any respiratory problems.

Julia reports that she has been swimming in pools since then and is eager to go skiing. She denies any emotional difficulty or any intrusive thoughts regarding the exposure.

REVIEW OF SYSTEMS: Julia apparently had meningitis in 1996, from which she made a full recovery. She has hives with Sulfa drugs.

PHYSICAL EXAMINATION: Height 51", weight 72, BP 80/44, Pulse 80. Her physical examination was normal. There was no evidence of mucous membrane or skin abnormality. Her chest was clear, including forced expiration. There was no emotional difficulty.

Admin/ ill/Pts/McMorris – Heavern, Julia 4-27-04

Mr. David McMorris, Esq.
Thornton and Naumes
RE:    Heavern, Julia
April 27, 2004
Page Two


DISCUSSION:  Based on the information available to me, with a reasonable degree of medical certainty, Julia Heavern experienced a transient skin reaction to chloramines at the pool in New Hampshire.  This bothered her for several weeks, and she has made a complete recovery.  There is no evidence of persistent respiratory or psychological adverse effects.  She has made a complete recovery, and I do not believe that there is any future risk of disease related to this exposure.

Chloramines are liberated by improper maintenance of swimming pool chemistry.  They are highly irritating gases, which accumulate just above the surface of the pool when there is imbalance of chlorine.  Chloramines are well known to cause skin irritation and are associated with mucous membrane irritation and in some cases mucous membrane and respiratory irritation.  In some cases, they may cause transient or permanent asthma.  There is a causal relationship between improper maintenance of the pool and the accumulation of chloramines at high enough levels to cause mucous membrane and skin irritation.

In summary, there is a causal relationship between improper maintenance of the swimming pool and the development of the transient skin rash of Julia Heavern.

Thank you very much for the opportunity to examine Julia.  Please let me know if I can answer any questions or be of further assistance.

Sincerely,


William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer


WBP/jg



ATTORNEYS AT LAW
# Thornton & Naumes LLP

Michael P. Thornton (NH, ME & MA)
John T. Barrett (NH & MA)
Robert T. Naumes
Neil T. Leifer (ME, NJ & MA)
David J. McMorris (NY & MA)
Edwin L. Wallace
Robert M. Byrne, Jr.
David C. Strouss
Joseph R. Donohue (ME & MA)
Patricia M. Flannery
Andrew S. Wainwright
Michael A. Lesser
Marilyn T. McGoldrick
Garrett J. Bradley
Brad J. Mitchell
Kristen Marquis Fritz

100 Summer St. • 30th Floor • Boston, MA 02110 • 617-720-1333
Toll Free 800-431-4600    FAX# 617-720-2445
www.tenlaw.com

June 21, 2004

Mr. Andrew Marthaler
Claims Specialist
Zurich North America
1400 American Lane
Schaumburg, IL 60196-1056

| Re: | Our Client: | Nicole Heavern |
| | Your Insured: | Marriott Courtyard |
| | Date of Incident: | 3/15/03 |
| | Your File No.: | 964117146 |

Dear Mr. Marthaler:

As you are aware, this office represents the above-named minor individuals with respect to personal injuries sustained on March 15, 2003 while swimming in an indoor pool at the Marriott Courtyard in Concord, NH.

Please allow this letter to serve as our demand for settlement.

## FACTS/LIABILITY

On, March 15, 2003, the above minor children along with their parents were guests at the Marriott Courtyard in Concord, NH. On that date, the children were swimming in the indoor pool. Upon exiting the pool that afternoon, the children began to complain of skin burning and had troubled breathing. Their parents were very concerned after examining severe facial redness and burns upon the children's faces and heads. Blotchy redness was also located on the arms and legs.

At this point, Ms. Heavern, mother of Julia and Nicole Heavern, located the day manager, Rose Reidsema who after seeing the children called the poison control unit for assistance. Ms. Reidsema informed the parents that the pool had been shocked two weeks ago and had to be shut down due to the excess in chemical. She also indicated that the pool had been "shocked" the very morning that the children were swimming in it. When Ms. Reidsema contacted the poison control unit and explained the situation, the poison control unit informed Ms. Reidsema and the parents that the reactions the children were experiencing was due to high chlorine levels in the pool and suggested that they be seen by their pediatricians. Ms. Reidsema apologized to the parents and stated that their usual practice in shocking the pool was to shock the pool and wait 24 hours before allowing any patrons in the pool.

## INJURIES

Nicole Heavern, age 9, suffered 2nd degree burns due to the high level of chemicals in the pool. Nicole also experienced trouble breathing and nausea for several days after the incident, causing her to miss two days of school. She was seen at South Shore Hospital for her injuries. I have attached her medical records for your review. Nicole was prescribed Bactroban and Bacitracin. Nicole, six months after the incident, is still suffering from severe chapped skin mainly above her upper lip which tends to become red and tender, hurting to the touch. Nicole must apply sun block constantly since her skin has become extremely sensitive due to the chemical burns she received. Nicole's parents indicate she has continued having breathing problems which she never had prior to this incident.

On January 28, 2004, Nicole was examined by Dr. William B. Patterson who indicated that Nicole suffered from transient skin relation caused by chlorine byproducts. He also notes that she has developed mild Reactive Airways Disease (asthma) which is causally related to her exposure with the possibility of necessary future treatment. Obviously her parents are very concerned since she never had asthma previously.

The pool's chemical levels were dangerously high on the date the above minor children were occupying it (I have attached a copy of the Pool & Spa Chemical Test Results taken on the date of the incident as well as evidence regarding the "shocking of pools"), no indication or warning that the pool had been shocked the morning the children were in it was given, causing all of these minor children to suffer chemical burns and troubled breathing. These children now have problems going outdoors which, as you can understand, is devastating to children.

Kindly contact me if you wish to discuss settlement of these matters within 30 days of your receipt of this correspondence. Demand for settlement, given that she will be dealing with asthma, which will require treatment for the rest of her life, is $500,000. If I do not hear from you I will be forced to file suit. Please feel free to contact Attorney Garrett Bradley in my office to discuss this case as well.

I look forward to hearing from you and settling this matter in an amicable fashion.

Respectfully submitted,

John T. Barrett

JTB:tc
Enclosures

One Harborside Drive
Logan International Airport
East Boston, MA  02128
617 568-6500
617 568-6573  fax

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer



**Logan International Health Center**
*An affiliate of Occupational Health + Rehabilitation Inc*

June 3, 2004

Mr. David McMorris, Esq.
Thornton and Naumes
100 Summer Street, 30th Floor
Boston, MA 02110

RE:    HEAVERN, NICOLE
SSN:    H05-21-1993

Dear Mr. McMorris:

On 01/28/04, I performed a consultation on Nicole, who is referred for evaluation of possible adverse effects related to her exposure to a swimming pool in 03/03 in New Hampshire. The examination consisted of a history taken first from her parents and by themselves and then a history and physical examination performed in private with Nicole. Their histories were similar.

HISTORY OF PRESENT ILLNESS: Nicole is a 10-year-old, fifth grade girl, who reports that she was in a swimming pool while on a girl scout ski trip at a Marriott Hotel in New Hampshire in 03/03. She went swimming at approximately 8:00 a.m. and experienced no difficulty. Following a break, the girls went back into the pool at about 10:00 a.m. Nicole states that all their faces "started to get red." She noticed difficulty with her breathing and coughing. She denies wheezing. She states that her face became very red, and she had white dots. Her parents took her home and then to a hospital, where she was given a cream to put on. Some of her skin peeled off over the next couple of weeks, but "not that much." Her skin then cleared up and was fine for months. Recently, she experienced mild rash on her nose, which she treated with some pads that her mother obtained at the drug store.

Nicole reports that following the exposure, she had some difficulty breathing with running. She did not have any substantial cough or wheezing. She now feels that her breathing has returned to normal.

She has swum in pools this summer without any emotional difficulty. She has swum at a hotel pool and denies any intrusive thoughts or emotional difficulties related to the exposure.

REVIEW OF SYSTEMS: Nicole's medical history is generally negative. Specifically, she denies prior respiratory difficulty, cough with exertion, or recognized allergies.

PHYSICAL EXAMINATION: Nicole is 94 lbs. and 60". Her skin was normal. Her mucous membranes were normal. Her chest is clear, including the forced expiration.

Mr. David McMorris, Esq.
Thornton and Naumes
RE:    Heavern, Nicole
June 3, 2004
Page Two


LABORATORY TESTING: In view of Nicole's history of cough, we performed pulmonary function tests. There was adequate reproducibility among her tests. The best ratio of FEV1/FVC was 73.9 percent of predicted. Her FEF $_{25-75}$ was 1.5, which is diminished. These tests demonstrate probable mild small airways disease.

Because of her cough following exposure and the mild small airways disease on baseline spirometry, a methacholine challenge test was performed at Quincy Medical Center on 4-29-04. A copy of this is enclosed, and the test was positive, indicating mild Reactive Airways Disease.

DISCUSSION: Based on the information available to me, with a reasonable degree of medical certainty, Nicole experienced a significant skin rash related to exposure to chlorine and other irritants in the pool. This has fully resolved, and there is no evidence of ongoing symptoms or future risk related to this exposure.

With a reasonable degree of medical certainty, there is a causal relationship between Nicole's exposure to chloramines in the swimming pool and the development of mild asthma. I note the following:

- Nicole did not have any respiratory symptoms or disease prior to the exposure.
- Nicole had substantial respiratory difficulty immediately following the exposure. There is a negative family history for asthma and allergies.
- There is a known causal relationship between exposure to chlorine byproducts and the development of asthma.
- The pulmonary function test and methacholine challenge test are consistent with the diagnosis of mild asthma.

This would qualify as a case of Reactive Airways Disease Syndrome (RADS), a well documented respiratory condition in which acute exposure to high levels of irritants causes persistent airway reactivity and sensitivity.

In the future it is likely that Nicole will be at risk of reactive airways upon exposure to cold, irritants, or possibly allergens. At the current time, treatment is probably not necessary. If she experiences shortness of breath with exertion or after these exposures, treatments are available that would be helpful to her. Educating Nicole, her family, and her primary care physician regarding the nature of her pulmonary disease is indicated, since future treatment may be necessary. Based on our current knowledge of RADS, her condition is likely to remain stable for the foreseeable future. Worsening is a possibility. A several month course of treatment with inhaled steroids might be a reasonable measure to see if her airway reactivity would decrease; this could be discussed with an allergist or pulmonary expert.

Mr. David McMorris, Esq.
Thornton and Naumes
RE:    Heavern, Nicole
June 3, 2004
Page Three

In summary, Nicole Heavern experienced a transient skin relation caused by chlorine byproducts. She has also developed mild Reactive Airways Disease (asthma) which is causally related to her chlorine byproducts exposure. Additional treatment will almost certainly be necessary in the future.

Thank you very much for the opportunity to examine Nicole. Please let me know if I can be of further assistance.

Sincerely,

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer

Enclosure

WBP/jg



ATTORNEYS AT LAW
# Thornton & Naumes LLP

Michael P. Thornton (NH, ME & MA)
John T. Barrett (NH & MA)
Robert T. Naumes
Neil T. Leifer (ME, NJ & MA)
David J. McMorris (NY & MA)
Edwin L. Wallace
Robert M. Byrne, Jr.
David C. Strouss
Joseph R. Donohue (ME & MA)
Patricia M. Flannery
Andrew S. Wainwright
Michael A. Lesser
Marilyn T. McGoldrick
Garrett J. Bradley
Brad J. Mitchell
Kristen Marquis Fritz

100 Summer St. • 30th Floor • Boston, MA 02110 • 617-720-1333
Toll Free 800-431-4600    FAX# 617-720-2445
www.tenlaw.com

June 21, 2004

Mr. Andrew Marthaler
Claims Specialist
Zurich North America
1400 American Lane
Schaumburg, IL 60196-1056

Re:    Our Clients:        Kerin Mitchell
       Your Insured:       Marriott Courtyard
       Date of Incident:   3/15/03
       Your File No.:      964117146

Dear Mr. Marthaler:

As you are aware, this office represents five minor individuals with respect to personal injuries sustained on March 15, 2003 while swimming in an indoor pool at the Marriott Courtyard in Concord, NH.

Please allow this letter to serve as our demand for settlement.

## FACTS/LIABILITY

On, March 15, 2003, the above minor children along with their parents were guests at the Marriott Courtyard in Concord, NH. On that date, the children were swimming in the indoor pool. Upon exiting the pool that afternoon, the children began to complain of skin burning and had troubled breathing. Their parents were very concerned after examining severe facial redness and burns upon the children's faces and heads. Blotchy redness was also located on the arms and legs.

At this point, Ms. Heavern, mother of Julia and Nicole Heavern, located the day manager, Rose Reidsema who after seeing the children called the poison control unit for assistance. Ms. Reidsema informed the parents that the pool had been shocked two weeks ago and had to be shut down due to the excess in chemical. She also indicated that the pool had been "shocked" the very morning that the children were swimming in it.

When Ms. Reidsema contacted the poison control unit and explained the situation, the poison control unit informed Ms. Reidsema and the parents that the reactions the children were experiencing was due to high chlorine levels in the pool and suggested that they be seen by their pediatricians. Ms. Reidsema apologized to the parents and stated that their usual practice in shocking the pool was to shock the pool and wait 24 hours before allowing any patrons in the pool.

## INJURIES

Kerin Mitchell, age 9, suffered facial burns, chest pains and is currently on an inhaler. She did not have any use of an inhaler prior to the accident. Kerin's face still gets red with even a slight interaction in the sun. She was prescribed Bacitracin, ointment and applies Neutrogena cream to her skin several times per day especially while being out in the sun due to her facial burns.

Kerin was examined by Dr. William B. Patterson on January 28, 2004 at which time Dr. Patterson diagnosed Kerin as having sustained an irritative skin rash due to over-exposure to chloramines in the pool at the Marriott Hotel.

The pool's chemical levels were dangerously high on the date the above minor children were occupying it (I have attached a copy of the Pool & Spa Chemical Test Results taken on the date of the incident as well as evidence regarding the "shocking of pools"), no indication or warning that the pool had been shocked the morning the children were in it was given, causing all of these minor children to suffer chemical burns and troubled breathing. These children now have problems going outdoors which, as you can understand, is devastating to children.

Kindly contact me if you wish to discuss settlement of these matters within 30 days of your receipt of this correspondence. Demand for settlement is $50,000. If I do not hear from you I will be forced to file suit.

I look forward to hearing from you and settling this matter in an amicable fashion.

Respectfully submitted,

John T. Barrett

JTB:tc
Enclosures

One Harborside Drive
Logan International Airport
East Boston, MA 02128
617 568-6500
617 568-6573 fax

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer



Logan International Health Center
*An affiliate of Occupational Health + Rehabilitation Inc*

June 3, 2004

Mr. David McMorris, Esq.
Thornton and Naumes
100 Summer Street, 30th Floor
Boston, MA 02110

RE:   MITCHELL, KERIN
SSN:   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

Dear Mr. McMorris:

On 01/28/2004, I performed a consultation examination on Kerin, who was referred for evaluation of potential adverse side effects related to an exposure to a swimming pool in New Hampshire in the winter of 2003. First, I spoke with Kerin's parents by themselves and then examined Kerin by herself. Their histories were consistent.

HISTORY OF PRESENT ILLNESS: Kerin reports that she was in New Hampshire with a girl scout troop, when she went swimming early in the morning. She had no difficulty with this, and she and others took a break. They then went back into the pool at about 10 a.m., following which, she noted a burning in her face, stomach pains, and coughing. She is clear that the pool was "much more irritating" the second time. After the pool, her face became very red, especially at night. She felt sick to her stomach and did not sleep well. She experienced diarrhea but not vomiting. She was able to stay and do some skiing and snow tubing. Her breathing was not bothering her that much afterwards, although there might have been "a little wheezing".

The patient reports that prior to the incident, she was able to do all her sports without difficulty. Following the incident, she was given an inhaler by her personal physician in April, 2003. She has used it intermittently ever since, only with exercise. She now notes some shortness of breath if she sprints. She states that she occasionally notices wheeze but no cough. She has been ice skating in Hull a couple of times, and she has not noticed any shortness of breath, cough, or wheeze. She had not used the inhaler on the morning of this examination. She states that the inhaler does help her with sports but she is "not as good as I used to be". She finds it upsetting that she is not as good at basketball.

Kerin denies any skin problems at all subsequent to resolution of the rash. She also denies any eye problems. She finds that she doesn't really think very much about the incident and denies any intrusive thoughts.

REVIEW OF SYSTEMS: The patient had a fracture of the right arm. Her mother reports that she had endoscopy as a younger child and experienced adverse reactions to Valium, Versed, and Sulfa.

Admin/Bill/Pts/McMorris – Mitchell, Kerin 6-3-04

Mr. David McMorris, Esq.
Thornton and Naumes
RE:     Mitchell, Kerin
June 3, 2004
Page Two

FAMILY HISTORY:  Family history is significant in that her mother has asthma as a teen and she has an older sister with mild asthma.

PHYSICAL EXAMINATION:  Kerin is a cooperative young girl in no distress.  Her height is 55 inches, weight 97 pounds, BP 104/70, pulse 66.  Her chest is clear, including to forced expiration.  Her conjunctiva were normal.  Her skin was normal.

LABORATORY TESTING:  Pulmonary function tests were performed.  They were completely normal, including measurements of small airway function (FEF $_{25-75}$ and PEF).  Because Kerin reported shortness of breath with exercise, we had her run briefly outdoors (estimated outdoor temperature 20 degrees).  Following this, she returned to the office relatively quickly, stating that her breathing had been affected.  There was no change in her breathing after exercise.  A bronchodilator was administered and there was no improvement in her breathing function.

Based on her reports of pulmonary symptoms and her family history, a methacholine challenge test was performed on 4-16-04 at Quincy Medical Center.  The results are enclosed, and they are normal.

DISCUSSION:  Based on the information available to me, with a reasonable degree of medical certainty, Kerin Mitchell experienced an irritative skin rash due to over-exposure to chloramines in the pool at the Marriott Hotel.  This lasted for weeks to months and has fully resolved.  I do not believe that there is any additional treatment needed or long-term implications of this rash.

Although Kerin has symptoms consistent with mild asthma, the normal methacholine challenge test and the normal pulmonary function test argue against this diagnosis.  Medication is probably not going to be helpful for her, and shortness of breath is probably related to deconditioning or other factors.  She should be encouraged to exercise.

In summary, Kerin Mitchell experienced an irritative skin rash following over exposure to chlorine byproducts in the Marriott Hotel pool, which has resolved.  There is no evidence of ongoing pulmonary disease related to this exposure.

Thank you very much for the opportunity to examine Kerin.  Please let me know if I can be of further assistance.

Sincerely,

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer

Enclosure

WBP/jg

Admin/Bill/Pts/McMorris – Mitchell, Kerin  6-3-04



ATTORNEYS AT LAW
# Thornton & Naumes LLP

Michael P. Thornton (NH, ME & MA)
John T. Barrett (NH & MA)
Robert T. Naumes
Neil T. Leifer (ME, NJ & MA)
David J. McMorris (NY & MA)
Edwin L. Wallace
Robert M. Byrne, Jr.
David C. Strouss
Joseph R. Donohue (ME & MA)
Patricia M. Flannery
Andrew S. Wainwright
Michael A. Lesser
Marilyn T. McGoldrick
Garrett J. Bradley
Brad J. Mitchell
Kristen Marquis Fritz

100 Summer St. • 30th Floor • Boston, MA 02110 • 617-720-1333
Toll Free 800-431-4600    FAX# 617-720-2445
www.tenlaw.com

June 21, 2004

Mr. Andrew Marthaler
Claims Specialist
Zurich North America
1400 American Lane
Schaumburg, IL 60196-1056

> Re:  Our Client:        Taylor Vieira
>       Your Insured:      Marriott Courtyard
>       Date of Incident:  3/15/03
>       Your File No.:     964117146

Dear Mr. Marthaler:

As you are aware, this office represents five minor individuals with respect to personal injuries sustained on March 15, 2003 while swimming in an indoor pool at the Marriott Courtyard in Concord, NH.

Please allow this letter to serve as our demand for settlement.

## FACTS/LIABILITY

On, March 15, 2003, the above minor children along with their parents were guests at the Marriott Courtyard in Concord, NH. On that date, the children were swimming in the indoor. Upon exiting the pool that afternoon, the children began to complain of skin burning and had troubled breathing. Their parents were very concerned after examining severe facial redness and burns upon the children's faces and heads. Blotchy redness was also located on the arms and legs.

At this point, Ms. Heavern, mother of Julia and Nicole Heavern, located the day manager, Rose Reidsema who after seeing the children called the poison control unit for assistance. Ms. Reidsema informed the parents that the pool had been shocked two weeks ago and had to be shut down due to the excess in chemical. She also indicated that the pool had been "shocked" the very morning that the children were swimming in it.

When Ms. Reidsema contacted the poison control unit and explained the situation, the poison control unit informed Ms. Reidsema and the parents that the reactions the children were experiencing was due to high chlorine levels in the pool and suggested that they be seen by their pediatricians. Ms. Reidsema apologized to the parents and stated that their usual practice in shocking the pool was to shock the pool and wait 24 hours before allowing any patrons in the pool.

### INJURIES

Taylor Vieira, age 10, suffered facial burns, troubled breathing and a sore throat as well. Taylor's face began to peel approximately two weeks after the incident mid April due to the chemical burns she received. She was prescribed Aquaphor for her burns to the facial area. She too must take precautions when going outdoors. Medical records are attached hereto as well.

Taylor was examined by Dr. Patterson on January 28, 2004. Dr. Patterson's examination revealed that Taylor suffered a significant skin reaction for several weeks to months due to the exposure of chemicals in the pool at the Marriott Hotel. Dr. Patterson also noted that Taylor has explained to him that she nervous about pools.

The pool's chemical levels were dangerously high on the date the above minor children were occupying it (I have attached a copy of the Pool & Spa Chemical Test Results taken on the date of the incident as well as evidence regarding the "shocking of pools"), no indication or warning that the pool had been shocked the morning the children were in it was given, causing all of these minor children to suffer chemical burns and troubled breathing. These children now have problems going outdoors which, as you can understand, is devastating to children.

Kindly contact me if you wish to discuss settlement of these matters within 30 days of your receipt of this correspondence. Demand for settlement is $150,000. If I do not hear from you I will be forced to file suit. Please feel free to contact Attorney Garrett Bradley in my office to discuss this case as well.

I look forward to hearing from you and settling this matter in an amicable fashion.

Respectfully submitted,

John T. Barrett

JTB:tc
Enclosures



One Harborside Drive
Logan International Airport
East Boston, MA 02128
617 568-6500
617 568-6573 fax

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer

**Logan International Health Center**
*An affiliate of Occupational Health + Rehabilitation Inc*



APR 28 2004

April 27, 2004

Mr. David McMorris, Esq.
Thornton and Naumes
100 Summer Street, 30th Floor
Boston, MA 02110

RE:    VIEIRA, TAYLOR
SSN:   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

Dear Mr. McMorris:

On 04/28/2004, I performed a consultation on Taylor Vieira, a pleasant young girl who was seen for evaluation of adverse health effects related to her exposure to a swimming pool in the winter 2003. Examination consisted of a detailed interview of her parents, followed by an interview and examination of Taylor by herself. The histories were similar.

HISTORY OF PRESENT ILLNESS: Taylor is an 11-year-old girl who was exposed in the winter, 2003 to a swimming pool at a Marriott Hotel in New Hampshire on a ski trip. At approximately 8 AM, she and others entered the pool and swam without difficulty. They then took a break and re-entered the pool at about 10 AM. Relatively quickly, her face became red and several others in the pool complained of mucosal membrane and skin irritation. They left the pool and subsequently learned that the pool had been "shocked" with chlorine.

Upon coming home, the family took her to a doctor, who prescribed a cream for her skin. She noticed that the skin was very red and much of her facial skin peeled. Within a few months, this has fully resolved. She reports that she was fine until about a month ago, when she began to notice a little rash under her nose, eyes and chin. She was given another cream by a physician for this.

Although Taylor noticed some mucosal membrane irritation at the time of the exposure, she and her family described her breathing as fine. She is an active athlete, playing basketball and soccer. She specifically denies any difficulty with cold air exercise. She reports that her eyes are fine.

She states that she is "a little nervous about pools." She has gone swimming with friends in their pools, and she hopes to go skiing this year. She does not have any avoidance related behavior or any severely negative attitudes toward Marriott which would suggest the presence of PTSD.

REVIEW OF SYSTEMS: The patient had her tonsils and adenoids removed at Massachusetts Eye and Ear Infirmary. She believes that she is allergic to penicillin.

Admin/Bill/Pts/McMorris - Vieira, Taylor 4-27-04

Mr. David McMorris, Esq.
Thornton and Naumes
RE:    Vieira, Taylor
April 27, 2004
Page Two

PHYSICAL EXAMINATION: Taylor is a cooperative young girl in no acute distress. Her height is 60.5 inches and weight 104 and bp 110/44, pulse is 64.

Her mucous membranes were normal and chest is clear, including the forced expiration. A fine maculopapular rash was observed on her forehead, the bridge of her nose, and her cheeks. It was not present on her neck or hands.

DISCUSSION: Based on the information available to me, with a reasonable degree of medical certainty, Taylor Vieira had a significant skin reaction to elevated levels of chloramines and other irritants at the swimming pool in New Hampshire. This reaction lasted for weeks to months and has fully resolved. There is no evidence of ongoing medical problems related to this, and I do not believe that this reaction puts her at increased risk of future disease. There is no evidence of respiratory impairment, and her skin problems from the exposure have fully resolved. It is likely that the current skin rash observed by the family is related to hormonal changes.

Chloramines are liberated by improper maintenance of swimming pool chemistry. They are highly irritating gases, which accumulate just above the surface of the pool when there is imbalance of chlorine. Chloramines are well known to cause skin irritation and are associated with mucous membrane irritation and in some cases mucous membrane and respiratory irritation. In some cases, they may cause transient or permanent asthma. There is a causal relationship between improper maintenance of the pool and the accumulation of chloramines at high enough levels to cause mucous membrane and skin irritation.

In summary, there is a causal relationship between improper maintenance of the swimming pool and the development of the transient skin rash of Taylor Vieira.

Thank you very much for the opportunity to examine this pleasant young girl.

Sincerely,

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer


WBP/jg

**VIEIRA,TAYLOR M (798842)   Encounter Date: 3/17/03**

## Office Visit (BTPED)

798842   VIEIRA,TAYLOR M                          12/31/1992   F

**Encounter Number: 77691644**
Date      Provider                    Department    Center
3/17/2003  N638-JORESS, NAOMI NP       BTPED         BTR

**Reason for visit:**
   RASH [123]   Cmt: rash on face from pool chemical exposure

Vitals: Temp 97.4 | Wt 85 lbs 13 oz (38.919 kg)

Additional Progress Notes:
   mom reports pt and sib exposed to excess chlorine in pool in NH 2 d ago-pt and
   sib went swimming 1 hr after pool "shocked"-normaly pool closed x 24 hr after
   being shocked per mom; pt w/very red face w/swelling under eyes-have been applying
   cool compresses w/relief, no c/o st, pt tried to ski yesterday but sweat burned
   face so pt stopped skiing, pt sleeping well and no other c/o

   O: active child; bright red face-no blisters or peeling, minimal swelling under
   eyes; tms nl; eyes nl; thr sl red-no exud-not tender; few shoddy AC nodes; lungs
   clear

   A: resolving contact derm from chemicals

   P: mom and pt reassured, continue cool compresses and aquaphor, disc need for incr
   sunscreen this yr
   call prn

   ADDENDUM: mom reports pt still snoring w/? slp apnea-more noticeable now, was eval
   by ENT in 1998, will refer back to ENT-mom given # to call

Level of Service:  EST. PAT. L3, OFFICE VISIT [99213]

Order(s): CANCELED: ENT HVMA EXT [R6202]  Order #: 91213493 Class: External

**Primary Visit Diagnosis:** DERMATITIS - CONTACT FROM CHEMICALS [692.4]
   **Other Visit Diagnosis:** SLEEP APNEA [780.57]
**Visit Diagnosis Changes:**
   Added    780.57 by JORESS PNP, NAOMI (1116), Mon Mar 17, 2003  2:30 PM
   Added    692.4 by JORESS PNP, NAOMI (1116), Mon Mar 17, 2003  2:30 PM

**MISC.ORDERS**
   **R6202    ENT HVMA EXT**                         **[#91213493] Canceled**
      Priority: Routine  Class: External

      **Canceled by STRONG, AMY M. on Tue Apr 8, 2003  3:02 PM**
      **Reason: DUPLICATE REQUEST**

Encounter Closed By: JORESS PNP, NAOMI On 03/17/2003



ATTORNEYS AT LAW
# Thornton & Naumes LLP

Michael P. Thornton (NH, ME & MA)
John T. Barrett (NH & MA)
Robert T. Naumes
Neil T. Leifer (ME, NJ & MA)
David J. McMorris (NY & MA)
Edwin L. Wallace
Robert M. Byrne, Jr.
David C. Strouss
Joseph R. Donohue (ME & MA)
Patricia M. Flannery
Andrew S. Wainwright
Michael A. Lesser
Marilyn T. McGoldrick
Garrett J. Bradley
Brad J. Mitchell
Kristen Marquis Fritz

100 Summer St. • 30th Floor • Boston, MA 02110 • 617-720-1333
Toll Free 800-431-4600    FAX# 617-720-2445
www.tenlaw.com

June 21, 2004

Mr. Andrew Marthaler
Claims Specialist
Zurich North America
1400 American Lane
Schaumburg, IL 60196-1056

> Re:    Our Client:        Brian Vieira
>        Your Insured:      Marriott Courtyard
>        Date of Incident:  3/15/03
>        Your File No.:     964117146

Dear Mr. Marthaler:

As you are aware, this office represents five minor individuals with respect to personal injuries sustained on March 15, 2003 while swimming in an indoor pool at the Marriott Courtyard in Concord, NH.

Please allow this letter to serve as our demand for settlement.

## FACTS/LIABILITY

On, March 15, 2003, the above minor children along with their parents were guests at the Marriott Courtyard in Concord, NH. On that date, the children were swimming in the indoor pool. Upon exiting the pool that afternoon, the children began to complain of skin burning and had troubled breathing. Their parents were very concerned after examining severe facial redness and burns upon the children's faces and heads. Blotchy redness was also located on the arms and legs.

At this point, Ms. Heavern, mother of Julia and Nicole Heavern, located the day manager, Rose Reidsema who after seeing the children called the poison control unit for assistance. Ms. Reidsema informed the parents that the pool had been shocked two weeks ago and had to be shut down due to the excess in chemical. She also indicated that the pool had been "shocked" the very morning that the children were swimming in it.

◎ ◀▦▶ ▪

When Ms. Reidsema contacted the poison control unit and explained the situation, the poison control unit informed Ms. Reidsema and the parents that the reactions the children were experiencing was due to high chlorine levels in the pool and suggested that they be seen by their pediatricians. Ms. Reidsema apologized to the parents and stated that their usual practice in shocking the pool was to shock the pool and wait 24 hours before allowing any patrons in the pool.

## INJURIES

Brian Vieira, age 8, suffered facial burns, troubled breathing and sore throat. Brian's right eye remains irritant and red. He must administer prescribed eye drops three times per day and is still experiencing asthma type symptoms. Brian also experienced a burning of the skin for weeks following the incident. Brian was required to wear a hat and sun block to school to avoid the sun hitting his had and face. Medical records are attached from Brian's pediatrician and eye doctor.

Brian was examined by Dr. William B. Patterson on January 28, 2004. Dr. Patterson's examination revealed that Brian's rash was due to the chemical exposure of the pool at the Marriott Hotel. He also notes that Brian had pre-existing asthma which was exacerbated for 1-2 months because of this chlorine exposure.

The pool's chemical levels were dangerously high on the date the above minor children were occupying it (I have attached a copy of the Pool & Spa Chemical Test Results taken on the date of the incident as well as evidence regarding the "shocking of pools"), no indication or warning that the pool had been shocked the morning the children were in it was given, causing all of these minor children to suffer chemical burns and troubled breathing. These children now have problems going outdoors which, as you can understand, is devastating to children.

Kindly contact me if you wish to discuss settlement of these matters within 30 days of your receipt of this correspondence. Demand for settlement is $150,000. If I do not hear from you I will be forced to file suit. Please feel free to contact Attorney Garrett Bradley in my office to discuss this case as well.

I look forward to hearing from you and settling this matter in an amicable fashion.

Respectfully submitted,

John T. Barrett

JTB:tc
Enclosures

One Harborside Drive
Logan International Airport
East Boston, MA 02128
617 568-6500
617 568-6573 fax

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer



**Logan International Health Center**
*An affiliate of Occupational Health + Rehabilitation Inc*

April 19, 2004

Mr. David McMorris, Esq.
Thornton and Naumes
100 Summer Street, 30th Floor
Boston, MA 02110

RE:    VIEIRA, BRIAN
SSN:   V02-23-1995

Dear Mr. McMorris:

This letter is in follow-up to a consultation performed on Mr. Vieira on 01/28/04. Brian is an 8-year-old boy who was exposed to irritants in a swimming pool last year. You referred him for consultation regarding any adverse health effects related to his swimming pool exposure.

HISTORY OF PRESENT ILLNESS: I took separate histories from Brian's parents and from himself. They were consistent. In early 2003, Brian and his family were at a Marriott Hotel in New Hampshire on a ski trip. Brian reports that he went swimming early in the morning without difficulty. Following this, he spent some time with his family, during which "they shocked the pool. They didn't tell us, and we went in the pool. " Brian and his parents report that nearly everyone in the pool experienced rashes and burning in their faces. Brian reports that he opened his eyes under water and that his eyes "burned." He believes that his eyes "still bother me. My vision is a little blurry, and I wear glasses. " He states that his left eye gets a little red. Brian and his parents report that his face was extremely red following the exposure and that over the next week, much of the skin peeled. He had a red and sensitive face for a number of weeks, which had effectively resolved within a couple of months. He does not report any difficulty with the skin at this time.

Brian reports that following the exposure, he lost his voice and his throat burned. He states that both of these have fully resolved.

Brian reports that he has experienced mild asthma for about two years. When he is exposed to cold air, he coughs. Sometimes his breathing slows down. He has been prescribed an inhaler, but this has expired, and he doesn't use it regularly. He participates in basketball, baseball, soccer, and football. He notes that, "I have been having trouble breathing. I breathe heavier when I come off the floor." He has not used a peak flow meter to measure his breathing, and he has not used any

Mr. David McMorris, Esq.
Thornton and Naumes
RE:    Vieira, Brian
April 19, 2004
Page Two

recent medication. When asked about his current breathing in early 2004 compared to his breathing before the pool exposure, he states that it is "about the same."

When asked about his emotional reaction to the exposure, he states that he has gone swimming a number of times at his next door neighbors. He has not gone to any hotel pools, only private pools. He has not gone on any skiing trips, but he has gone on other trips. He states that if he were to go into a hotel pool, he might be "a little nervous," but he denies any meaningful ongoing anxiety pertaining to the incident.

REVIEW OF SYSTEMS: Brian's medical history is basically negative other than as described.

PHYSICAL EXAMINATION: Brian is 56-1/2 inches high, weight is 87 pounds, BP 100/64, pulse 64. His skin was normal, without evidence of rash or sensitivity, his chest is clear, including to forced expiration. His conjunctiva demonstrated prominent blood vessels bilaterally, without any obvious inflammation.

LABORATORY TESTS: Pulmonary function tests were performed. There was generally good consistency among the five tests performed. The flow volume loops were appropriate. The FVC was 2.58 (predicted - 2.44, 106 percent). The FEV1 was 1.80 (predicted - 2.14, 84 percent). The FEF 25-75 was 1.4 (predicted - 2.5, 56 percent predicted). I interpret these tests as suggesting the likely presence of mild small airways disease (asthma).

A Methacholine Challenge Test was performed at Quincy Medical Center on 4/9/04. The baseline spirometry was slightly better than the test performed at the time of our examination on 1/28/04. Brian had a more than 20% decrease in FEV1 after methacholine, indicating that this was a positive Methacholine Challenge Test. This confirms the diagnosis of airways hypersensitivity (asthma).

DISCUSSION: Exposure to chlorine, chloramine, and other irritants in swimming pools is a known cause of respiratory irritation, especially when inadequate or improper chlorination of the pools occurs. Based on the information available to me, with a reasonable degree of medical certainty, my opinion is that there was a causal relationship between Brian's rash and his exposure to chloramine gases liberated by improper maintenance of the pool chemistry. This rash by Brian's history lasted for several weeks and fully resolved. I do not believe that there are any long term complications from this.

Brian had pre-existing asthma and was therefore susceptible to aggravation of the asthma by his exposure to irritants. It seems probable that his asthma was aggravated for a period of one to two months following the exposure. He likely has returned to his baseline, although additional medical records would be helpful.

Mr. David McMorris, Esq.
Thornton and Naumes
RE:    Vieira, Brian
April 19, 2004
Page Three

Given the mildly abnormal pulmonary function test currently, it is more likely than not that there
has not been significant, permanent aggravation of his asthma.  My opinion is that pre-exercise use
of Albuterol or Cromolyn is likely to enable him to function more effectively in his athletic
endeavors.  Using a peak flow meter and correlating the results with various activities or
exposures would also be helpful in providing more complete relief of his pulmonary symptoms.
This should be discussed with his personal physician.

In summary, Brian's rash was causally related to chemical exposure in the pool.  He experienced a
1 – 2 month aggravation of his asthma due to the exposure.  It is unlikely that there has been a
permanent effect on Brian's vision by the exposure, but a formal evaluation by an experienced
ophthalmologist would offer a more definitive opinion.  There do not appear to be any ongoing
emotional or other clinical issues.

Thank you very much for the opportunity to examine Brian.  Please let me know if I can be of
further assistance.

Sincerely,

William B. Patterson, MD, MPH, FACOEM
Chief Medical Officer

WBP/jg

**EXHIBIT F**

## COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

SUPERIOR COURT
C.A. NO.:
PLCV2005-00287-B

```
                                    )
Julia Heavern, by her parents       )
and next friends, Denise and Paul   )
Heavern, Nicole Heavern, by her     )
parents and next friends, Denise    )
and Paul Heavern, Kerin Mitchell,   )
 by her parents and                 )
next friends, Ellen and Jim Mitchell,)
Taylor Vieira, by her parents and   )
next friend, Kathy and Steve Vieira,)
 and Brian Vieira, by his parents   )
and next friends, Kathy and         )
Steve Vieira,                       )
                                    )
        Plaintiffs,                 )
                                    )
                                    )
                                    )
v.                                  )
                                    )
                                    )
Marriott International, Inc.,       )
And Zurich North America            )
Defendants.                         )
                                    )
```

**COMPLAINT AND JURY CLAIM**

## PARTIES

1.    Plaintiff, Julia Heavern, is a minor represented by her parents and next friends, Denise and Paul Heavern who resides at 7 Glover Avenue, Hull, Massachusetts.

2.    Plaintiff, Nicole Heavern, is a minor represented by her parents and next friends, Denise and Paul Heavern who resides at 7 Glover Avenue, Hull, Massachusetts.

3.    Plaintiff, Kerin Mitchell, is a minor represented by her parents and next friends, Ellen and Jim Mitchell, who resides at 34 Nantasket Avenue, Hull, Massachusetts.

4.    Plaintiff, Taylor Vieira, is a minor represented by his parents and next friends, Kathy and Steve Vieira, who resides at 51 Warfield Avenue, Hull, Massachusetts.

5.    Plaintiff, Bryan Vieira, is a minor represented by his parents and next friends, Kathy and Steve Vieira, who resides at 51 Warfield Avenue, Hull, Massachusetts.

6.     Defendant, Marriott International, Inc. (hereinafter "Marriott" or "Courtyard Marriott", is a corporation with a principle place of business at 10400 Fernwood Road, Department 862, Bethesda, Maryland.

7.     Defendant, Zurich North America (hereinafter "Zurich") is a corporation with a principle place of business at 1400 American Lane, Schaumburg, Illinois.

## JURISDICTION

7.     The plaintiffs' cause of action arises from the defendant's (1) transacting business in Massachusetts; (2) contracting to supply and/or sell goods in Massachusetts; (3) doing or causing a tortuous act to be done in Massachusetts; and/or (4) causing the consequence of a tortuous act to occur within Massachusetts, and the defendants do, or solicit business, or engage in a persistent course of conduct or derive substantial revenue from the sale of goods in Massachusetts.

## FACTS

8.     On or about March 15, 2003, the plaintiffs were guests at the Courtyard, Marriott in Concord, New Hampshire.

9.     On or about March 15, 2003, the plaintiffs spent approximately six hours swimming in the Courtyard Marriott's indoor swimming pool.

10.    On information and belief, on the morning of said date, the defendant had "shocked" the swimming pool with excessive amounts of chlorine or other chemicals.

11.    On information and belief, on this date, defendants posted no warnings that the pool had excessive or hazardous amounts of chlorine or other chemicals, nor did the defendants prevent guests from using the swimming pool.

12.    On information and belief, the defendants did not use ordinary care, which included their regular practice of closing the pool after "shock" treatments and waiting until the chemical levels were safe before allowing patrons to use the pool.

13.    On information and belief, the defendants did not warn of the non-obvious danger, known to the defendants, that the swimming pool contained unsafe and hazardous levels of chlorine and other chemicals.

14.    On information and belief, the defendants did not make reasonable inspections in order to discover whether their guests were using the swimming pool during times when the levels of chlorine or other chemicals were at unsafe or dangerous levels.

15.    Due to the exposure of high levels of chemicals in the defendant's swimming pool, all five plaintiffs sustained various injuries of varying degrees. These injuries include, but

are not limited to, chemical skin burns, chest discomfort, breathing difficulty, red and sore eyes and asthma.

16.     As a direct and proximate cause of this incident, plaintiffs have accrued significant medical expenses, and certain plaintiffs will continue to accrue medical expenses. Furthermore, plaintiffs were temporarily incapacitated and prevented from participating in their usual activities for a substantial period of time, and have suffered varying degrees of emotional injuries.

## COUNT I
## JULIA HEAVERN, PPA DENISE AND PAUL HEAVERN V. COURTYARD MARRIOTT NEGLIGENCE

17.     Plaintiff, Julia Heavern, PPA Denise Heavern adopts by reference all of the allegations above, each inclusive, as though fully set forth herein.

18.     As a direct and proximate result of the negligence of the defendant, the plaintiff Julia Heavern suffered personal injuries, including, but not limited to, 1st degree burns, acute breathing difficulty, and transient skin reaction.

WHEREFORE, plaintiff, Julia Heavern, PPA Denise Heavern, demands judgment against the defendant, Courtyard Marriott, in an amount to be determined at trial, together with interest and costs and such other relief as this Honorable Court may deem necessary.

## COUNT II
## NICOLE HEAVERN, PPA DENISE AND PAUL HEAVERN V. COURTYARD MARRIOTT NEGLIGENCE

19.     Plaintiff, Nicole Heavern, PPA Denise Heavern adopts by reference all of the allegations above, each inclusive, as though fully set forth herein.

20.     As a direct and proximate result of the negligence of the defendant, the plaintiff Nicole Heavern suffered personal injuries, including, but not limited to acute difficulty breathing and nausea, burning skin, peeling skin, continuing chapped skin above her upper lip, enduring difficulty breathing, mild rash, transient skin reaction, and mild Reactive Airways Disease (asthma).

WHEREFORE, plaintiff, Nicole Heavern, PPA Denise Heavern, demands judgment against the defendant, Courtyard Marriott, in an amount to be determined at trial, together with interest and costs and such other relief as this Honorable Court may deem necessary.

## COUNT III
## KERIN MITCHELL, PPA ELLEN AND JIM MITCHELL V. COURTYARD MARRIOTT
## NEGLIGENCE

21.    Plaintiff, Kerin Mitchell, PPA Kathy Vieira, adopts by reference all of the allegations above, each inclusive, as though fully set forth herein.

22.    As a direct and proximate result of the negligence of the defendant, the plaintiff Kerin Mitchell suffered personal injuries, including, but not limited to facial burns, breathing difficulty, sore throat, significant skin reaction for several weeks, and emotional trauma.

WHEREFORE, plaintiff, Kerin Mitchell, PPA Ellen Mitchell, demands judgment against the defendant, Courtyard Marriott, in an amount to be determined at trial, together with interest and costs and such other relief as this Honorable Court may deem necessary.

## COUNT IV
## TAYLOR VIEIRA, PPA KATHY STEVE VIERA V. COURTYARD MARRIOTT
## NEGLIGENCE

23.    Plaintiff, Taylor Vieira, PPA Kathy Vieira, adopts by reference all of the allegations above, each inclusive, as though fully set forth herein.

24.    As a direct and proximate result of the negligence of the defendant, the plaintiff Taylor Vieira suffered personal injuries, including, but not limited to facial burns, breathing difficulty, sore throat, significant skin reaction for several weeks, and emotional trauma.

WHEREFORE, plaintiff, Taylor Vieira, PPA Kathy Vieira, demands judgment against the defendant, Courtyard Marriott, in an amount to be determined at trial, together with interest and costs and such other relief as this Honorable Court may deem necessary.

## COUNT V
## BRYAN VIEIRA, PPA KATHY AND STEVE VIERA V. COURTYARD MARRIOTT
## NEGLIGENCE

25.    Plaintiff, Bryan Vieira, PPA Kathy Vieira, adopts by reference all of the allegations above, each inclusive, as though fully set forth herein.

26.    As a direct and proximate result of the negligence of the defendant, the plaintiff Bryan Vieira suffered personal injuries, including, but not limited to facial burns, breathing difficulty, sore throat, enduring red and irritated eyes, skin burns, skin irritation for weeks following the incident and exacerbation of pre-existing asthma as well as emotional injuries.

WHEREFORE, plaintiff, Bryan Vieira, PPA Kathy Vieira, demands judgment against the defendant, Courtyard Marriott, in an amount to be determined at trial, together with interest and costs and such other relief as this Honorable Court may deem necessary.

## COUNT VI
## JULIA HEAVERN, ET AL., V ZURICH NORTH AMERICA
### VIOLATION OF M.G.L. c. 93A and
### M.G.L. CHAPTER 176D, SECTION 3(9)(f)

27.    Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth within.

28.    At all times references herein, defendants and insurance coverage through Zurich North America ("Zurich").

29.    After unsuccessful attempts to resolve the matter over the phone, on June 21, 2004, each plaintiff sent Zurich a demand for settlement.

30.    The defendants failed to respond to this demand letter within 30 days.

31.    The defendant has failed to make a fair and equitable offer of settlement in response to said demands for relief.

32.    The defendant's failure to make such an offer is a violation of G.L. c. 176D, §3(9) (f) in that said defendant failed to effectuate a prompt, fair and equitable settlement of a claim in which liability has become reasonably clear.

33.    The defendant's failure to effectuate such a settlement is an unfair and deceptive trade act or practice within the meaning of G.L. c. 93A § 2.

34.    The defendant is liable to the plaintiff for the plaintiff's actual damages and for punitive damages up to three times the actual damages, plus interest, costs and attorney's fees.

**Wherefore,** the plaintiffs demand judgment against the defendant in an amount to be determined at trial, including treble damages, together with interest, costs and such other relief as this Honorable Court deems necessary and proper.

### PLAINTIFFS RESERVE THE RIGHT TO A JURY TRIAL ALL COUNTS
### CONTAINED WITHIN THIS COMPLAINT

Respectfully submitted by the Plaintiffs,
By their Attorney,

Garrett Bradley, Esquire BBO # 629240
THORNTON & NAUMES, LLP
100 Summer Street, 30th Floor
Boston, MA 02110
(617) 730-1333

Dated: March 10 2005

 

*Occupational Health & Safety, Environmental Consultants*

*OccuHealth, Inc.*
*44 Wood Avenue*
*Mansfield, MA 02048*

*Tel. (508) 339-9119*
*Tel. (800) 729-1035*
*Fax (508) 339-2893*
*thamilton@occuhealth.com*

**DRAFT**

December 29, 2004

Mr. Garrett J. Bradley
Thornton & Naumes, LLP
100 Summer Street
30ᵗʰ Floor
Boston, MA 02110

RE: Minors Involved in Pool Incident

Dear Mr. Bradley:

1.    I am a Certified Industrial Hygienist, an engineer and a professional health and safety
      consultant. I have been certified to practice industrial hygiene since 1980 and have been
      working in the profession of health and safety for over 25 years. Industrial hygiene is
      that science and art devoted to the anticipation, recognition, evaluation, and control of
      those environmental factors or stresses that may cause sickness, impaired health and
      well-being, or significant discomfort and inefficiency among workers or among the
      citizens of the community. I have attached a summary detailing my education and some
      of my qualifications and experience (Exhibit A).

2.    I have been the owner of OccuHealth, Inc. for over 15 years. OccuHealth is a
      professional consulting firm that specializes in providing comprehensive health, safety
      and environmental services to both public and private corporations.

3.    I worked as the Manager of Industrial Hygiene for a large chemical company for 13 years
      where I was directly involved in the health and safety aspects for the manufacture of
      chemicals and other products for the 5ᵗʰ largest chemical company (1986) in the United
      States.

4.   In 1989 I founded OccuHealth, Inc. and began providing consulting services in the field of occupational health, safety, and environmental issues with a specialty in chemical safety. I have worked as the safety and industrial hygiene consultant for clients who have had issues with safety and health including clients with pool chemical issues. In general, I have consulted on incidents where pool swimmers have reported illnesses such as asthma and breathing issues, skin reactions and burning eyes. In each of these cases, I have been able to investigate the issue and make recommendations for proper care of the pool chemistry that prevented a recurrence of symptoms in the users of the pools. The issues are usually easily resolved once the offending issue has been identified and the pool chemistry is improved.

5.   I have read and reviewed the following documents in order to provide the comments and opinions in this letter.

   a.   Letter from John Barrett to Andrew Marthaler, RE: Client Kerin Mitchell, dated June 21, 2004 with attached medical records.

   b.   Letter from John Barrett to Andrew Marthaler, RE: Client Nicole Heavern, dated June 21, 2004 with attached medical records.

   c.   Letter from John Barrett to Andrew Marthaler, RE: Client Brian Vieira, dated June 21, 2004.

   d.   Letter from John Barrett to Andrew Marthaler, RE: Client Taylor Vieira, dated June 21, 2004.

   e.   Letter from John Barrett to Andrew Marthaler, RE: Client Julia Hearern, dated June 21, 2004.

   f.   Pool and SPA Chemical Test Results dated 3-15-04.

*Comments on Swimming Pool Water Chemistry and Operator Training*

6.   The science of swimming pool chemistry and treatment is well documented and information on proper procedures is freely available from multiple sources including, but not limited to, pool chemical suppliers, pool maintenance contractors, and the internet. Treatment of swimming pool water requires frequent testing and adjustment so that the pool remains in a usable condition. The frequency of testing must be adjusted to meet the utilization of the pool; i.e., pool chemistry testing and treatments should be increased or adjusted as the use of the pool is increased, and vice versa. Also, there are several basic rules for the use of pools that must be followed if the users are to be properly protected from harm which may include illnesses caused or exacerbated by bacteria or chemicals in or released by the pool water.

7.  Understanding of the chemistry of swimming pool water is basic to the understanding of the maintenance of proper conditions which will prevent health issues with swimmers. The chemistry involves the measurement of various parameters and then taking action and includes items such as: temperature, hardness, free and total chlorine, chloramines, shocking, buffering, balancing, pH, stabilizing. This list is not comprehensive but is used to illustrate the fact that having a good understanding of the chemical issues that are involved in proper pool operation is not simple. Also, it illustrates the necessity for providing effective and qualified training of the pool maintenance staff.

*Comments on Swimming Pool Water Treatment Chemicals and Terminology*

8.  Chlorine based sanitizers are typically supplied on a continuous basis into the pool water. The pool water must be tested for chlorine levels daily and more frequently if the pool is in use, especially by children. The chlorine level is used to determine if proper disinfection is occurring. Routine chlorination kills harmful microorganisms that can cause health-related problems, such as gastroenteritis, Legionnaires disease, ear infections and athlete's foot. Learning how to properly test the water allows for identification of the chlorine residual and demand.

When chlorine chemicals are added to pool water they react with contaminants to form chloramines. The Free Available Chlorine (FAC) level is the portion of the total chlorine remaining in chlorinated water that has not reacted with contaminants - and is "free" to kill bacteria and other contaminants. The FAC level in a swimming pool should be in the range of 1.5 to 3 parts per million in order to maintain good water quality.

Combined Available Chlorine (CAC) or chloramines are the portion of chlorine in the water that has reacted and combined with ammonia, nitrogen-containing contaminants and other organics such as perspiration, urine and other swimmer waste. Chloramines can cause eye irritation and chlorine odors. A good indicator of an excess of chloramines and the need of immediate treatment of the pool water by shocking is when the combined chlorine level climbs near or above 0.2 PPM

Total Chlorine is the sum of both the free available and combined chlorines.

Shock treatment is the practice of adding significant amounts of an oxidizing chemical to water to destroy ammonia, nitrogen-containing and organic contaminants. Adding chlorine as a shock treatment can also control algae and bacteria. When added to the water, the level of Free Available Chlorine is required to be above 10 ppm. The effect of this treatment is the release of both free chlorine and the chloramines into the air above the pool surface thus cleaning the water of the Combined Available Chlorine. Immediately after the addition of the high dose of shock chemicals is the most dangerous time for swimmers as the pool will have a high level of free chlorine in the water and the air above the pool surface will have a high level of chloramines that are being released by the water. Skin contact with the water and inhalation of the chlorine and chloramines at this time is extremely hazardous to the health. The pool area must be maintained off

limits for all swimmers both during and after the shock treatment until the excess free chlorine and the chloramines in the water have been released and ventilated from the pool room area. Use of the pool and pool room must be restricted until the pool water has been tested and the free chlorine level has dropped back into the acceptable range for swimming (1.5 to 3.0 ppm)

Contary to what most people think, a strong chlorine smell is not an indication of too much chlorine in the pool but actually a red flag that a shocking treatment may be required to correct the problem. Shock treatments add a larger than normal amount of oxidizing chemicals to pool water. This dose destroys organic contaminants and oxidizes ammonia and nitrogen compounds to rid the area of irritating chloramine odor and, if chlorine is used for the purpose, to sanitize the water.

According to published pool standards for public pools, the ideal frequency for a shock treatment is every week, depending on use and water temperature. For high school pools, shocking may be required three times a week or more as a preventive measure. As stated above, a good indicator of the need for a shocking dose is when Combined Available Chlorine climbs near or above 0.2 ppm

9.   The frequency of shocking is dependent upon several factors such as temperature and bather load. Cloudiness and/or strong chlorine odors are indications that a shock treatment is needed. Shock treatment is the "burning up of pollutants with a strong oxidizing chemical".

10.   Chlorine is a hazardous product with some forms of it being more dangerous for the handler and the environment than other forms. Chlorine in a solution of water at levels found in swimming pools (1.5 to 3.0 ppm) poses very little danger for swimmers. Allergic reactions to chlorine are rare, however some individuals may experience skin irritation.

Incorrect amounts of chlorine when added to a pool will cause health problems. Too little chlorine will raise the occurrence of eye burn and skin irritation because the level of combined chlorine compounds is increased. Too much chlorine will take days to drop to safe levels (1.5 to 3 ppm).

11.   Chloramines, found in poorly balanced water, are the cause of red eyes. Extremely high levels of chlorine (greater than 6 ppm) in the water could possibly release enough gas off of the surface in certain conditions to render breathing difficulties.

*Comments on Responsibility*

12.     I have reviewed the documents and have formed opinions on the cause of the health
        effects experienced by the minors in the Marriott Courtyard pool in Concord, NH.
        According to the statement of Rose Reidsema, the pool had been shocked the morning of
        the 15th of March.  Although the Pool & SPA Chemical Test Results (Test Results) have
        all of the normal ranges for the parameters tested, it is our opinion to a reasonable
        professional certainty that the test results are not in agreement with the facts of the case.
        It is not possible that a swimming pool of the size typically built in a Marriott Courtyard
        could be shocked between 8 am and 12 noon on any given day and have normal readings
        during this time period as presented in this document.  In fact, the document begs the
        question as to why the pool would have been shocked at all.  The Test Results show
        normal levels of chlorine and combined chlorine at both 8 am and at noon, so conducting
        a shocking treatment would not have been indicated.  It is our opinion that the Test
        Results were either not recorded properly on 3-15-04 or they were performed by an
        untrained technician.

13.     It should also be noted that the technician who completed the Test Results form actually
        increased the chlorine level in the pool at noon on the day of the incident.  This finding
        does not make any sense as it is not logical that a recently shocked pool would need any
        additional chlorine within four hours of a shock treatment if the shocking had been done
        correctly even with the presence children in the pool.

14.     Another issue with the Test Results is that the chlorine levels are not being recorded to
        two significant digits.  Since the need for a shocking dose is indicated when the
        Combined Available Chlorine climbs near or above 0.2 ppm, it is necessary to measure
        the Total Chlorine and the Free Chlorine to at least two significant digits in order to get
        this type of accuracy.  This was not done and the Test Results as recorded cannot be
        reasonably evaluated for Combined Available Chlorine which is the prime indicator for a
        shocking treatment to be conducted.

15.     Since the minors suffered from multiple health effects, it appears that more than one
        chemical issue was present on they day they used the pool including free chlorine in the
        water and the gases released into the air above the pool (breathing space) that are the
        result of the shocking treatment.  Each of these is discussed below.

16.     <u>Free Chlorine in the Water</u>.  After the pool was shocked, it would have had a very high
        level of chlorine present.  This level would have exceeded the normal operating range of
        1.5 to 3.0 ppm.  Levels of chlorine required for proper shocking exceed 10 ppm.  Since
        the level achieved during the shocking treatment was not measured or recorded, it is not
        possible to determine the level that was present.  However, swimming in a pool with
        levels of free chlorine above 6.0 ppm (as needed for a proper shocking treatment) is

dangerous and can cause severe skin and lung reactions, especially in susceptible individuals, including children. The symptoms reported by the minors - skin and lung distress - is in direct agreement with the presence of high free chlorine which would be present in a recently shocked pool.

After shocking, the pool should have been tested to make sure that the target level of free chlorine (approximately 12 ppm) had been met. Also during the time period after the shocking, the free chlorine level should have been measured to get a reading of the levels over time. Reuse or opening of the pool to the guests should not have occurred until the free chlorine level in the pool had dropped and returned to the normal level of 1.5 to 3.0 ppm and all odors and airborne chemicals released by the shocking treatment had been effectively ventilated from the space. This entire process typically takes several hours and several measurements to complete. There is no evidence that this practice was followed by the Marriott Courtyard staff on the day of the incident.

16. Gases in the Pool Breathing Space. The shocking treatment is designed to release the combined chlorine (chloramines) and the excess free chlorine into the atmosphere directly above the pool surface where it can be ventilated from the space. Swimming in a pool during or immediately after a shocking treatment is dangerous and can cause severe breathing problems for anyone. The fact that the minors were allowed to swim in the pool shortly after the shock treatment was an unsafe event. The symptoms reported by the minors is in direct agreement with presence of unacceptable levels of both chlorine and chloramines in the air that they would have been breathing during the time period after a shocking treatment.

17. In summary, it is our opinion to a reasonable professional certainty that the failure of the Marriott Courtyard personnel to properly restrict use of the swimming pool until the shocking treatment had effectively been completed and the chlorine level brought down to normal levels is the direct cause of the health issues suffered by the minors. The shocking treatment was conducted on the morning of the 15th shortly before the children had been swimming in the pool. This resulted in their being exposed to the excess free chlorine in the water and to the released chlorine and chloramines in the air of the pool room. These exposures are in direct agreement with the health complaints reported by the minors and the physician's reports on their health.

This concludes my remarks on this matter. The conclusions in this letter are based on the review of the listed documents. We reserve the right to modify or expand on the opinions expressed upon receipt of further information on which to make those opinions.

Sincerely,
OccuHealth, Inc.

Thomas E. Hamilton, CIH



## UNITED STATES DISTRICT COURT
## DISTRICT COURT OF MASSACHUSETTS

|  |  |
|---|---|
| Julia Heavern, et al. | ) |
| Plaintiffs, | ) ) ) |
| v. | ) **CIVIL ACTION NO.: 05-11170-MEL** ) ) ) |
| Mariott International Inc. and Zurich North America, | ) ) ) |
| Defendants. | ) ) |

### AFFIDAVIT OF ATTORNEY GARRETT BRADLEY

I, Garrett Bradley, attorney for the Plaintiffs in the above referenced matter

depose and say as follows:

1.    I had phone conversations with the defendant's adjustor, and did not receive any settlement offer in the above referenced case within 30 days of mailing the June 21, 2004 Written Demand Letters.

2.    Prior to the filing of the lawsuit on March, 10, 2005 I had not received an offer for settlement for any of the five plaintiffs in the above mentioned case.

3.    At no time prior to the commencement of this suit did the defendant's attorneys request to examine any of the plaintiffs in these cases despite the fact that two separate experts linked the children's injuries to the chlorine levels in the pool at the Marriot.

Signed under the penalties of perjury this day the 22nd of August 2005.

Garrett Bradley

## CERTIFICATE OF SERVICE

I hereby certify that on this day the 22nd of August, 2005, I served the above notice on the Defendants in the above-entitled action by mailing a copy thereof, postage prepaid, to counsel of record:

Peter G. Hermes
Gina A. Fonte
HERMES, NETBURN, O'CONNOR &
SPEARING P.C.
111 Devonshire Street, 8th Floor
Boston, MA 02109
617-728-0050

Garrett Bradley